UNITED STATES *v.* DUNNINGTON.

DUNNINGTON *v.* UNITED STATES.

APPEALS FROM THE COURT OF CLAIMS.

Nos. 51, 52.    Argued November 18, 1892. — Decided December 8, 1892.

The estate forfeited by proceedings to judgment under the confiscation act of July 17, 1862, 12 Stat. 589, c. 195, and the joint resolution of the same date, 12 Stat. 627, is the life estate of the offender; the fee remaining in him after the confiscation, but without power of alienation until his disability is removed.

The conflicting cases on the subject of proceedings under that act reviewed, and *Illinois Central Railroad* v. *Bosworth*, 133 U. S. 92, and *Jenkins* v. *Collard*, 145 U. S. 546, followed.

A judicial condemnation, for the use of the United States, of land in Washington which had been so confiscated and sold, made during the lifetime of the offender from whom it had been taken under the confiscation act, is *held* to operate upon the fee as well as upon the life estate, assuming that due and legal notice of the proceedings for the condemnation were given.

The appraised value of the property in such proceedings for condemnation represents the whole fee, and the interests, both present and prospective, of every person concerned in it.

By the payment into court of the amount of the appraised value of the property so condemned, the United States was discharged from its whole liability, and was not even entitled to notice of the order for the distribution of the money.

THIS was a petition to recover from the United States the sum of $12,644, the alleged value of lot 3, square 688, in the city of Washington, condemned for the enlargement of the Capitol grounds. The following facts were found by the Court of Claims:

1. Charles W. C. Dunnington, the ancestor of the claimants,

was, on April 2, 1852, and subsequently up to June 29, 1863, seized or well entitled in fee simple of and to lot No. 3, in square No. 688, on the plats of the squares and lots of the city of Washington, with the improvements, buildings, rights, privileges, appurtenances and heriditaments, containing 5572 square feet. Said Dunnington, the ancestor, died August 14, 1887, leaving as his sole heirs the claimants in this case, as set out in their petition.

2. May 12, 1863, proceedings *in rem*, under the confiscation act of July 17, 1862, and joint resolution of the same date, 12 Stat. p. 589, c. 195, and p. 627, were begun by the defendants in the Supreme Court of the District of Columbia to confiscate said lot as the property of Dunnington, who was in rebellion against the United States. Under these proceedings the lot was duly condemned as enemy's property, and exposed to public sale, at which A. R. Shepherd became the purchaser and entered into possession.

3. Under the act of May 8, 1872, 17 Stat. 83, c. 140, § 6, proceedings were commenced in the Supreme Court of the District of Columbia, at the instance of the defendant, for the acquisition of land to enlarge the grounds around the Capitol, in which contemplated enlargement said lot No. 3 was included.

June 11, 1872, the Secretary of the Interior informed the court that he was unable to obtain the titles to said lands by mutual agreement with the owners. Thereupon the court appointed commissioners "to make a just and equitable appraisement of the cash value of the several interests of each and every owner of the real estate and improvements necessary to be taken for public use, and make return to said court."

October 16, 1872, said commissioners filed their report, in which the cash value of said lot No. 3 is appraised at $1.50 a square foot, and the improvements thereon at $1500. They also report that said lot contained 5572 square feet, thus making the whole value of lot and improvements $9858.

On the same day said appraisement was approved and adopted by the court, and the same was reported to the Secretary of the Interior.

March 15, 1873, the court made the following order:

" Whereas, it appears to the court that the owner or owners of each of said lots and parts of lots have failed and neglected to demand of the Secretary of the Interior the said appraised cash value of said lots and parts of lots, respectively, for fifteen days after the appraisement thereof by this court, it is therefore ordered that leave be, and is hereby, granted to said relator to deposit the said appraised values of said lots and parts of lots in this court, to the credit of the owners thereof, respectively, subject to be drawn therefrom only upon an order of this court for payment to the parties entitled ; and it is further ordered that upon the depositing of the money by the relator as hereinbefore provided, and notice thereof filed with the clerk of this court, possession of the property for which said deposit is made may be taken by the United States."

4. March 31, 1873, in pursuance of the above order, a certificate of deposit for the amount of said appraisement was filed with the court by the Secretary of the Interior.

Thereupon defendants took possession of said lot, and the same is now embraced in the ornamental grounds about the Capitol.

5. April 3, 1873, upon the petition of the heirs of Martin King, deceased, the appraised value of said lot and improvements, amounting to $9858, was, by order of the court, paid to William F. Mattingly, attorney of record for said heirs.

Said King was the vendee, through several intermediate conveyances, of said A. R. Shepherd.

6. The cash value of said lot No. 3 on August 14, 1887, was at the rate of $2 a square foot, $11,144; improvements, $1500; making together $12,644.

Upon the foregoing finding of facts the court decided, as a conclusion of law, that the claimants were entitled to recover $9858, for which judgment was entered. 24 Ct. Cl. 404. Both parties appealed to this court.

*Mr. George A. King* (with whom was *Mr. Charles W. Hornor* on the brief) for Dunnington's heirs.

From the time of the forfeiture of the estate under the confiscation act in 1863, until the 14th day of August, 1887,

neither Charles W. C. Dunnington nor his prospective or expectant heirs, nor any one of them, retained any right, title or interest, which could be asserted in any court of law or equity, in or to the said property, or any part thereof. Upon his death, at the latter date, the forfeiture of the property determined, and the fee simple vested *eo instanti* in the claimants, his heirs at law.

It was the duty of the United States as plaintiffs in the condemnation proceedings to have taken proper steps by application to the Supreme Court of the District of Columbia for the payment of the sum fixed by the appraisers as the value of the property to the persons entitled thereto by either apportioning the same between the then tenants — *per autre vie* and those who should appear after the death of Dunnington to be entitled to the property, or for the investment of the capital sum — the interest or rents thereof to be paid to said tenants *per autre vie* during the lifetime of the *cestui que vie*, and for the ultimate delivery of the capital after the death of said *cestui que vie* to those who might be entitled thereto, it being at that date impossible to ascertain with any approach to certainty who such persons would be.

The Supreme Court of the District of Columbia not having taken such proceedings, and having under misapprehensions then prevalent as to the effect of the confiscation act paid the whole of the appraised value to the tenants for life, the present claimants are not barred of their right by such action, but may seek their remedy in the Court of Claims under the constitutional duty of the United States to compensate for private property taken for public uses.

No rights having accrued to these claimants enforcible in any court until the death of their ancestor on the 14th of August, 1887, they are not chargeable with laches by reason of their non-assertion of such rights at an earlier date, nor had the statute of limitations barred their claim.

If these propositions are sustained their inevitable result will be a judgment in favor of these claimants for the value of their property thus taken for public uses.

In *Bigelow* v. *Forrest*, 9 Wall. 339, 350, this court had occa-

sion to consider the effect of a decree of forfeiture and sale under the confiscation act of July 17, 1862, and joint resolution of the same date. Construing the act and the resolution together this court held, that "they admit of no doubt that all which could under the law become the property of the United States or could be sold by virtue of a decree of condemnation and order of sale, was a right to the property seized, terminating with the life of the person for whose act it had been seized."

This decision was rendered at the December term, 1869, of this court. It was at first supposed by many to hold that what was forfeited was a life estate carved out of a fee, thus divesting the offender of his estate for life, but leaving in him the fee simple which was not only descendible to his heirs, but which he could dispose of and convey as he might any other property.

It was upon this ground that the Supreme Court of the District of Columbia in *Wallach* v. *Van Riswick*, 1 MacArthur, 73, held that even after a decree of confiscation of the property the confederate might execute a valid mortgage or conveyance of the property, which, however, would only take effect at the termination of his own life. This view, however, did not meet the approval of this court; for, on appeal, the decree was reversed. *Wallach* v. *Van Riswick*, 92 U. S. 202.

This decision was made at the October term, 1875. In *French* v. *Wade*, 102 U. S. 132, 134, decided October term, 1880, it was said, p. 134, referring to it: "This case has been followed many times since. *Pike* v. *Wassell*, 94 U. S. 711. It must now be considered as the settled rule of decision in this court."

We do not understand that *Wallach* v. *Van Riswick*, followed as this court has itself stated it to have been many times, and which had as long ago as 1880 become the settled rule of decision in this court, has ever been overruled, whatever distinctions or limitations may have been made as to its application and effect. Applying it to this case, it could not be known with any approach to certainty who would be his heirs at the time of his death, nor was it by any means certain that those who stood in the position of probable, prospective or presumptive heirs, would so remain till he died. The interest of an heir during

the lifetime of his ancestor is not recognized by the law. *Nemo est hœres viventis. Hutchins* v. *Hutchins,* 7 Hill, 104; *Jackson* v. *Kniffen,* 2 Johns. 31, 36; *S. C.* 3 Am. Dec. 390; *Doe* dem. *Winter* v. *Perratt,* 5 B. & C. 48.

Impossible, then, as it was to know who would be the persons interested in the estate after the forfeiture should have terminated by the death of the offender, how can it in justice be contended that it was the duty of either Dunnington or his children to intervene in the condemnation proceedings for the protection of their interests, — interests neither vested nor contingent, not recognized by the law, and which could not possibly come into being until the death of their ancestor, an event whose date could not be foretold, and which did not in fact occur for many years afterwards?

Manifestly it was the duty of the United States as plaintiffs, or of the court upon its own motion, to see to the interests of these claimants or of such as there might be in future times, and to have had the purchase-money so secured that upon the termination of the forfeiture by the death of the offender, Dunnington, the fee-simple price of the property would be ready for delivery to the heirs. *In re Phillips' Trusts,* L. R. 6 Eq. 250; *In re Pfleger,* L. R. 6 Eq. 426; Delalleau, Traité de l'Expropriation, 246, § 891.

Having thus made payment in its own wrong, and in prejudice of the rights of these claimants, the government cannot escape liability on the plea that they should have intervened. No intervention was possible. To hold against these parties would in effect permit the government to deprive them of their property without a day in court or an opportunity to be heard — a thing abhorrent to the judicial sense of justice, and expressly prohibited by Art. V of the constitutional amendments. *McVeigh* v. *United States,* 11 Wall. 259; *Lasere* v. *Rochereau,* 17 Wall. 437; *Windsor* v. *McVeigh,* 93 U. S. 274; *Ensminger* v. *Powers,* 108 U. S. 292, 301.

*Mr. Solicitor General* for the United States.

Mr. Justice Brown, after stating the case as above reported, delivered the opinion of the court.

This was a proceeding by the heirs at law of a person formerly in rebellion against the United States to recover the value of a lot of land, which had first been confiscated as enemy's property, and then condemned, in the hands of the purchaser, for the use of the government and for the enlargement of the Capitol grounds.

If the case were the simple one assumed by the claimants of a piece of private property taken for the public use without compensation to the owners, their right to recover its value would be beyond question; but there are other facts which put the case in a somewhat different light. Under the confiscation act of July 17, 1862, 12 Stat. 589, c. 195, the lot had been seized as the property of a public enemy and sold to Shepherd; by these proceedings the estate of Charles W. C. Dunnington, the ancestor of the claimants, was forfeited and vested in the purchaser. There remained, however, the reversionary interest, which upon his demise would become vested in these heirs.

During his life, and on May 8, 1872, Congress passed an act for the enlargement of the Capitol grounds, by taking in square No. 688, which included the lot in question. 17 Stat. 61, 83, c. 140, § 6. By section 7 it was made "the duty of the Secretary of the Interior to purchase, from the owner or owners thereof, at such price, not exceeding its actual cash value, as may be mutually agreed on, . . . such private property as may be necessary for carrying this act into effect." By section 8 it was directed "that if the Secretary of the Interior shall not be able to agree with the owner or owners . . . upon the price . . . it shall be his duty to make application to the Supreme Court of the District of Columbia, which court is hereby authorized and required, upon such application, in such mode, and under such rules and regulations as it may adopt, to make a just and equitable appraisement of the cash value of the several interests of each and every owner of the real estate," etc. By section 9: "that the fee simple of all premises so appropriated . . . shall, upon payment to the owner or owners, respectively, of the appraised value, or in case the said owner or owners refuse or neglect for

fifteen days after the appraisement . . . to demand the same, . . . upon depositing the said appraised value in the said court to the credit of such owner or owners, respectively, be vested in the United States." Section 11 provided "that no delay in making an assessment of compensation, or in taking possession, shall be occasioned by any doubt which may arise as to the ownership of the property, or any part thereof, or as to the interests of the respective owners; but in such cases the court shall require a deposit of the money allowed as compensation for the whole property or the part in dispute. In all cases, as soon as the United States shall have paid the compensation assessed, or secured its payment, by a deposit of money, under the order of the court, possession of the property may be taken."

The Secretary of the Interior, being unable to agree with the owners upon a price, on June 11, 1872, informed the court to that effect, and applied for the appointment of commissioners to make a just and equitable appraisement of the cash value of the several interests of each and every owner of the real estate and improvements, etc. On October 16, 1872, the commissioners filed their report, appraising the property at $9858. This appraisement was approved, and on March 15, 1873, the court made an order in the terms of the act, reciting that the owners had neglected to demand of the Secretary of the Interior the appraised cash values of said lots for fifteen days after the appraisement thereof by the court, and directing that leave be granted to deposit the appraised values in court to the credit of the owners, subject to be drawn therefrom only upon the order of the court for payment to the parties entitled, and that upon the deposit of the money and notice to the clerk, possession of the property might be taken by the United States. In pursuance of this order the money was deposited, and the United States took possession of the lot, which is now embraced within the ornamental grounds of the Capitol. Three days thereafter the entire appraised value of the lot, viz., $9858, was paid to the heirs of Martin King, who had become vested, through several intermediate conveyances, with the title acquired at the confiscation sale.

1. It is insisted by the claimants, in this connection, that these proceedings in condemnation were a nullity as to them; that from the time the estate was forfeited under the confiscation act until August 14, 1887, neither Charles W. C. Dunnington nor his heirs retained any right, title or interest in this property which could be asserted in a court of law or equity; that neither of them had any day in court in the condemnation proceedings, nor was it in law possible for them in any way to intervene or assert any claim whatever. By the joint resolution accompanying the confiscation act, (12 Stat. 627,) no proceedings under such act could be considered "to work a forfeiture of the real estate of the offender beyond his natural life." The status of the fee between the time the forfeiture took effect and the termination of the life estate, by the death of the offender, when his heirs took title to the property, has been the subject of much discussion and of some conflict of opinion in this court.

In the first case that arose under this act, *Bigelow* v. *Forrest*, 9 Wall. 339, Mr. Justice Strong suggested anomalies presented by the forfeiture of lands of which the offender was seized in fee, during his life and no longer, without any corruption of his heritable blood, and declined to inquire how, in such a case, descent could be cast upon his heir notwithstanding he had no seisin at the time of his death. In *Day* v. *Micou*, 18 Wall. 156, it was held that it was not the property itself of the offender which was made the subject of the seizure, even during his life, but it was his *interest* in the property, whatever that interest might be, and if he had, previously to his offence, mortgaged the land to a *bonâ fide* mortgagee, the mortgage was not divested, and the sale under the confiscation act passed the life estate subject to the charge.

The subject was considered at length in the case of *Wallach* v. *Van Riswick*, 92 U. S. 202, which was a bill for the redemption of a deed of trust of property in Washington subsequently confiscated, given by Wallach, a public enemy, to secure the payment of a promissory note. Wallach's interest in the property was, therefore, an equity of redemption, which the purchaser at the confiscation sale acquired and held with.

the security of the deed of trust, which he had also purchased. Wallach, having returned to Washington after the war, made a deed purporting to convey the lot in fee, with covenants of general warranty, to Van Riswick, the purchaser at the confiscation sale. The case stood in this condition until Wallach died, when his heirs, claiming that, after the confiscation proceedings, nothing remained in him which could be the subject of sale or conveyance, filed a bill to redeem the deed of trust, which was admitted to be still a valid lien upon the property. This court decided that the heirs had a right to redeem, holding in effect that, after the confiscation proceedings, the offender had no interest in the thing confiscated, which he could convey, or any power over it which he could exercise in favor of another. It was thought that Congress could not have intended to leave in the enemy a vested interest in the property which he might sell, and with the proceeds of, which he might aid in carrying on the war against the government; and support was found for that conclusion in the fact that the sixth section of the confiscation act declared that all sales, transfers or conveyances of any such property should be null and void. The question whether the fee remained in abeyance pending the life of the offender, or, if not, in whom it was vested, though discussed, was not decided.

In *Pike* v. *Wassell*, 94 U. S. 711, the question arose whether the heirs of the person whose estate had been confiscated could maintain an action to require the purchaser to keep down the taxes during the life of the offender. The defendants insisted that until the death of the offender the children had no interest in the property, and, therefore, could not appear to protect the inheritance. It was held to be true, as a general rule, that so long as the ancestor lives the heirs have no interest in his estate; but without undertaking to determine where the fee dwelt during the life estate, it was held that the heirs had an estate in expectancy, and as there was no one else to look after the interests of the succession, they might properly be permitted to do whatever was necessary to protect it from forfeiture or incumbrance. The case was held a proper one for a court of equity to interfere and grant

proper relief. It is evident from the language of the opinion in this case that the necessity of having some one to represent the fee and to protect the expectant estate of the heirs was present to the mind of the court. The question decided in *Wallach* v. *Van Riswick* was raised again in *French* v. *Wade*, 102 U. S. 132, and the former case was unequivocally affirmed.

The question what became of the fee was also discussed in *Illinois Central Railroad* v. *Bosworth*, 133 U. S. 92, 102, 103, and it was intimated, as a logical consequence from the decision in *Shields* v. *Schiff*, 124 U. S. 351, that the heirs took as heirs, and not by donation from the government; "that after the confiscation of the property, the naked fee, . . . subject, for the lifetime of the offender, to the interest or usufruct of the purchaser at the confiscation sale, remained in the offender himself; otherwise," said Mr. Justice Bradley, "how could his heirs take it from him by inheritance? But, by reason of his disability to dispose of, or touch it, or affect it in any manner whatsoever, it remained, as before stated, a mere dead estate, or in a condition of suspended animation. We think that this is, on the whole, the most reasonable view. There is no corruption of blood; the offender can transmit by descent; his heirs take from him by descent; why, then, is it not most rational to conclude that the dormant and suspended fee has continued in him?" It was further held in that case that if the disability of the offender be removed by a pardon or armistice, it restored him to the control of his property, so far as the same had never been forfeited or never become vested in another person.

In *Jenkins* v. *Collard*, 145 U. S. 546, 560, the estate of a public enemy was confiscated and sold. Subsequently to the sale he returned to Cincinnati, gave a deed in fee simple with covenants of general warranty, and it was held that he and all persons claiming under him were thereby estopped from asserting the title to premises, as against the grantee, or from conveying it to any other parties. It was further held that no disposition was ever made by the government of the reversion of the estate of the offending party; that it must, therefore, be construed to have remained in him, but without.

power to alienate it during his life; that the covenant of seisin in his deed estopped him and his heirs from asserting title to the premises against the grantee; and that the disability, if any, which had rested upon him against disposing of the fee was removed by the proclamation of pardon and amnesty of December 25, 1868, and he stood, with reference to that estate, precisely as though no confiscation proceedings had ever been had. "The amnesty and pardon, in removing the disability, if any, resting upon him, respecting that estate, enlarged his estate, the benefit of which enured equally to his grantee."

Upon the whole, we think the doctrine was too broadly stated in *Wallach* v. *Van Riswick*, that the effect of the confiscation was to divest the owner of every vestige of proprietary right over the property, and that the sounder view is that intimated in *Illinois Central Railroad* v. *Bosworth*, and *Jenkins* v. *Collard*, that the estate forfeited is the life estate of the offender, and that the fee remains in him, but without the power of alienating it during his life, unless the disability be removed. The theory of the common law, that the fee can never be in abeyance, but must reside somewhere, though seemingly somewhat fanciful, is founded upon a consideration of good sense, that there shall always be some one in existence to represent it in actions brought for its recovery, and to protect the interest of the heirs. In treating of this subject, Mr. Fearne, in his work on Contingent Remainders, vol. 2, sec. 60, book I. c. 3, § 1, observes, "that if a person limits a freehold interest in the land, by way of use or devise, which he may do, though he could not do so at the common law, to commence *in futuro*, without making any disposition of the intermediate legal seisin, . . . the legal seisin, property or ownership, except such part thereof, if any, as is comprised within a prior disposition of a vested interest, of course remains in the grantor and his heirs, or the heirs at law of the testator, until the arrival of the period, when according to the terms of the future limitation, it is appointed to reside in the person to whom such interest *in futuro* is limited." That the fee is not forfeited by the confiscation is also the logical deduction from the ruling in *Shields* v. *Schiff*, 124 U. S. 351, that the heirs

take by descent from the offender and not by donation from the government, inasmuch as, if there be no vestige of the estate left in the ancestor, it would be impossible for them to take by descent from him. This, too, disposes of the theory that the fee resides in the United States in trust for the heirs.

A necessary inference from the position assumed by the claimants, that neither Dunnington nor his heirs retained any interest in the forfeited estate, nor any right to intervene in these proceedings, is, that the government can obtain no title by condemnation to confiscated property during the life of the offender; that it can only condemn his life estate in the hands of the purchaser; and that, upon the termination of such estate, the heirs can recover the property, or at least compel the government to institute new proceedings for its condemnation. Such a construction would be intolerable. The march of public improvement cannot thus be stayed by uncertainties, complications or disputes regarding the title to property sought to be condemned; and the language of section 8 of the act of May 8, 1872, requiring the appraisement to be made of the several interests of *each and every owner* of the real estate, evidently contemplated an investiture of the entire title and of the interest of every owner, present and prospective, in the United States. We are, therefore, of opinion that the condemnation in this case operated upon the fee as well as upon the life estate, and as the presumption is, that due and legal notice was given of the proceedings, the appraisement was valid and binding upon Dunnington and his heirs. Assuming that, after the confiscation proceedings, he held only the naked fee without the power of alienation, the amnesty and pardon proclamation of the President of December 25, 1868, before the proceedings to condemn, removed his disability in this particular, and restored to him the right to make such use of the remainder as he saw fit.

2. A further question remains to be considered with regard to the proceedings taken after the payment of the money into court. It is insisted by the claimants that it was the duty of the United States, as plaintiffs in the condemnation proceedings, to take proper steps for the payment of the sum fixed by

the appraisers to the persons entitled thereto, by apportioning the sum between the tenants of the life estate and the heirs of Dunnington, or by the investment of the entire amount in interest bearing securities, for the benefit of the tenants of the life estate, until its termination, and for the ultimate delivery of the same to the heirs. It is a necessary deduction from our conclusion upon the other branch of the case that the appraised value of the property represents the whole fee, and the interests, both present and prospective, of every person concerned in the property, and such are the authorities. *Tide Water Canal Co.* v. *Archer*, 9 G. & Johns. 479, 525; *Ross* v. *Adams*, 4 Dutcher, (28 N. J. Law,) 160. The money, when deposited, becomes in law the property of the party entitled to it, and subject to the disposal of the court. *In re New York Central &c. Railroad*, 60 N. Y. 116; *South Park Commissioners* v. *Todd*, 112 Illinois, 379.

It is evident that the gist of the petitioners' complaint in this connection lies in the order of the Supreme Court of the District of Columbia of April 3, 1873, directing the payment of the entire appraised value of the lot to the heirs of Martin King, the vendee of Shepherd, who had purchased the life estate of Dunnington under the confiscation proceedings. Neither Dunnington, who was still living, nor his heirs, the present claimants, appear to have intervened in the condemnation proceedings, or to have raised a question as to the propriety of this payment. The proceedings, however, appear to have been carried on in strict conformity with the act, which required the Secretary of the Interior, in case he should be unable to purchase at private sale, to apply to the court for an appraisement, and in case the owner neglected to demand of him the appraised value within fifteen days, to pay the same into court, subject to being paid out to the persons entitled to it. Assuming that the payment of the entire amount to the heirs of King was a mistake, it is difficult to see how the United States can be held responsible for it. The courts of the United States are in no sense agencies of the Federal government, nor is the latter liable for their errors or mistakes; they are independent tribunals, created and sup-

ported, it is true, by the United States; but the government stands before them in no other position than that of an ordinary litigant. If the Federal government should proceed in a state court to condemn a piece of land for a public building, under a similar statute, and should pay the appraised value into court, and the court should award the money to the wrong party, it could not be seriously claimed that the government should pay it a second time. So, if a railway company should proceed to condemn land in this city for the purposes of a station, it would be completely exonerated from all further obligation by the payment of the appraised value to the depositary designated by the law under which the proceedings were taken. What was the United States to do after the deposit was made, to protect itself? It had discharged its entire liability by the payment into court, and was not entitled to notice even of the order for the distribution of the money. If the Attorney General had appeared, it might have been charged that he was a mere interloper, and that only the owners of the land were interested in the distribution of its proceeds. We are not without authority upon this subject. In a well-considered case in New Jersey, *Crane* v. *City of Elizabeth*, 36 N. J. Eq. (9 Stewart) 339, 343, it was held that the compensation fixed for the taking of certain land for streets was to include the value of all the interests, and was to be paid to the owner of the land if no other claimant intervened; and that, if in any case such owner ought not to receive the whole, timely resort must be had to the court of chancery, which would see to the equitable distribution of the fund. "The price to be paid," said the court, "by the city is to be the full value of all rights which may be impaired for the public benefit, and this is to be ascertained only after notice, not specially to individuals who alone may appear to guard their claims, but generally by the publicity which attends the doings of the council, and by newspaper advertisement, which will reach all alike, and under which all may be protected. The action of the city authorities has thus the distinctive quality of a proceeding *in rem*, a taking, not of the rights of designated persons in the thing needed,

but of the thing itself, with a general monition to all persons having claims in the thing. When, by the appraisement of the commissioners, the price of the thing is fixed, that price stands in place of the thing appropriated, and represents all interests acquired. . . . But if, in any special case, this owner ought not, in equity, to receive the fund, the Court of Chancery will, at the instance of any interested complainant, take charge of its proper distribution, and so secure those particular equities which the generality of the statute has left without express protection." In the case of *Heirs of John Van Vorst*, 1 Green Ch. (2 N. J. Eq.) 292, it was held that when the amount to be paid by a railroad company for land taken, was directed by the statute to be paid into court for the use of the owner or owners, no notice to the company was necessary, of an application by the owners for an order upon the clerk to pay over the money so deposited. A like ruling was made in *Haswell* v. *Vermont Central Railway*, 23 Vermont, 228, wherein the court observed that the purpose of the statute was to give railroad companies a certain and expeditious mode of relieving themselves from any further responsibility in the matter, by depositing the money according to the order of the chancellor; and that the railroad company, though cited by the claimant, was not bound to appear, and that, having no interest in the matter, it had no right to appeal the case. See also *Railroad Company* v. *Prussing*, 96 Illinois, 203; *Columbia &c. Bridge Co.* v. *Geise*, 34 N. J. Eq. 268; and *Cherokee Nation* v. *Kansas Railway*, 135 U. S. 641. We think the United States discharged its entire duty to the owners of this property by the payment of the amount awarded by the commissioners into court, and that, if there were any error in the distribution of the same, it is not chargeable to the government.

We do not wish to be understood as holding that there was necessarily an error in paying the money to the heirs of King. That question is not before us for consideration, and we are not called upon to express an opinion with regard to it.

The case is doubtless a hardship for the claimants, but it would be a still greater hardship if the government, without

fault upon its part, were obliged to pay the value of this lot a second time.

The judgment of the court below must be

*Reversed, and the case remanded, with directions to dismiss the petition.*