**UNITED STATES v. 576.734 ACRES OF LAND, MORE OR LESS, IN MONTGOMERY COUNTY, PA.**

**HANKIN v. UNITED STATES.**

No. 8502.

Circuit Court of Appeals, Third Circuit.

Argued Feb. 11, 1944.

Decided March 22, 1944.

Rehearing Denied April 24, 1944.

John C. Harrington, of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., C. James Todaro, Sp. Asst. to the Atty. Gen., and Vernon L. Wilkinson, Atty., Department of Justice, of Washington, D. C., on the brief), for appellant.

Joseph L. Prince, of Pottstown, Pa. (Moe Henry Hankin, of Abington, Pa., on the brief), for appellee.

Before MARIS, GOODRICH, and Mc-LAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

This is an appeal by the United States from a judgment of the District Court in favor of Moe Henry Hankin, the appellant alleging error in the admission of certain testimony and the exclusion of other testimony in the course of the trial.

The United States on March 23, 1942, filed a declaration of taking for a quantity of land in Montgomery County, Pennsylvania, and judgment thereon was filed the same day. The land was taken for the establishment of a Naval Reserve Aviation base. A portion of the land in question consisted of a tract known as the Kates Farm of some one hundred acres. The land was, at the time of taking, under lease to Moe Henry Hankin who had, at the time, a growing crop of grain on the land which had been planted the autumn before. The lessor settled with the government at a mutually agreed price for the farm, exclusive of the lessee's interest. The lessee and the government did not come to a settlement and the lessee, rejecting the report of the Board of View, brought his action in the District Court.

What the government took and was under obligation to pay for was the entire tract.[1] But since settlement had been made with the owner of the fee, the subject of litigation here was the value of that portion of the entire tract represented by the lessee's interest. There was no evidence of the value of the lease as such. Lacking that, other means of proof were properly resorted to.[2] The testimony covered the nature of the soil, the condition of the growing crop in March, the crop history for the year of neighboring farms and estimates of the cost to the tenant of producing the crop. Harvest time for the grain on this land, and similar grain on neighboring lands, was August.

Testimony was admitted of prices prevailing for such grain at that time.

The first point of the government's appeal is based on a dispute as to how far such proof may properly go. The lessee offered evidence that it was customary for farmers in this neighborhood to hold their grain until January for better prices and then offered testimony showing the prices for grain in January, 1943. This the court permitted over objection by the government. We think the admission of this testimony was erroneous and that the error was substantial.

The basic question to be determined was the value of the tenant's lease. The chief item in that value was the worth of the growing crop on March 23, 1942. The evidence concerning the nature of this piece of land, plus the history of growing crops in the neighborhood for that season was only relevant in so far as it gave a basis for determining the value of that crop on March 23. The United States was not obligated to pay for a matured crop; its obligation was limited to the value of the leasehold on the day of taking.[3]

An analogy is found in the cases dealing with the tortious destruction of growing crops. The basis of compensation is the value of the unmatured crop at the time it is destroyed.[4] But since it is not customary to buy or sell growing crops as such, no effective market value, in this sense, ordinarily exists. The formula adopted has been to take evidence on the probable yield and value of the crop when harvested at maturity and the cost of further care and cultivation, harvesting and marketing the crop, in order to determine the actual realizable value of the crop when destroyed; or what the crop when harvested would have brought, less the prospective cost of cultivation, harvesting and marketing.[5] In allowing such evidence, many decisions state that the market value of the yield to be considered is the market value "when", "at the time" or "at" maturity or harvesting and gathering of the crop.[6] This limitation is a rea-

---

[1] United States v. Dunnington, 1892, 146 U.S. 338, 351, 13 S.Ct. 79, 36 L.Ed. 996; Orgel, Valuation Under Eminent Domain (1936) § 107; 2 Lewis, Eminent Domain (3rd Ed. 1909) § 716.

[2] United States v. Miller, 1943, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55.

[3] Danforth v. United States, 1939, 308

U.S. 271, 283, 284, 60 S.Ct. 231, 84 L.Ed. 240; United States v. Miller, supra.

[4] McCormick, Damages (1935) 486.

[5] Id. at 487; 4 Restatement, Torts (1939) § 929, comment d.

[6] See for example, United States Smelting Co. v. Sisam, 8 Cir., 1911, 191 F. 293, 37 L.R.A.,N.S., 976; United Verde Copper Co. v. Ralston, 9 Cir., 1931, 46 F.2d

sonable one, for, it must be remembered, the general rule is that the measure of damages is the value of the crops at the time of injury or destruction. Since as a practical matter that value cannot be actually determined, the nearest time thereafter when a market value can be placed upon the crops is considered. The same limitation applies in the instant case.

The lessee argues that he is entitled to be paid for the most profitable use to which the property taken could be put, and that January prices of the grain harvested represent what could be done in the way of such profitable use. One answer to this contention is the rule already mentioned, that damages are paid for value of the property at the time of the taking. The other answer is that the United States did not take the farmer's grain as such. It took a leasehold and we are only interested in the value of the crop at maturity in so far as it helps establish the value of the leasehold at the time of taking. The taking itself in no way concerned what this leaseholder or any other might make as a warehouseman of grain held for favorable market.

We conclude that the admission of the evidence concerning January prices of grain was erroneous and that it necessarily got the jury's attention away from the elements of compensation proper for their consideration.

The United States also objects to the trial court's refusal to admit testimony concerning the cost to the lessee of the labor of planting the land with grass. Covenant 6 in the lease between them provides that: "Lessee agrees to sow grass seed but it is clearly understood that Lessor is to buy the grass seed at Lessor's expense and to furnish the grass seed when Lessee is ready to plant said wheat." Bearing in mind that the question at issue is the value of the lease, we think that the cost of sowing the seed is relevant. It makes the lease a more valuable thing to the lessor and a less valuable thing to the lessee just as clearly as if the lessee had promised to give the lessor a fraction of the crop. Whether the lessor had provided the grass seed so as to bring the lessee's obligation into effect we do not know. Since the case must go back for a new trial, the existence of such a burden upon the lessee, if it existed, may be developed.

The judgment of the District Court is reversed and the case remanded for further proceedings not inconsistent with this opinion.

1; Peppers Fruit Co. v. Charlebois, 1931, 39 Ariz. 195, 4 P.2d 905; Teller v. Bay & River Dredging Co., 1907, 151 Cal. 209, 90 P. 942, 12 L.R.A.,N.S., 267, 12 Ann.Cas. 779; Lester v. Highland Boy Gold Min. Co., 1904, 27 Utah 470, 76 P. 341, 101 Am.St.Rep. 988, 1 Ann.Cas. 761.