**[Cite as *Marchbanks v. Neema, L.L.C.*, 2025-Ohio-777.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

Jack Marchbanks, Director,
Ohio Department of Transportation

      Appellant

v.

Neema, LLC, et al.

      Appellees

Court of Appeals No.  E-24-010

Trial Court No.  2022 CV 0397

**<u>DECISION AND JUDGMENT</u>**

Decided:  March 7, 2025

\* \* \* \* \*

Dave Yost, Ohio Attorney General, and
William J. Cole and Kaia L. Jackson, Assistant
Attorneys General, for appellant.

Rachelle Kuznicki Zidar, Malorie A. Alverson,
and Michael R. Nakon, for appellee.

\* \* \* \* \*

**SULEK, P.J.**

{¶ 1} In this appropriation action, appellant, Jack Marchbanks, Director, Ohio

Department of Transportation ("ODOT"), appeals the February 6, 2024 judgment of the

Erie County Court of Common Pleas, following a jury verdict compensating Neema,

LLC ("Neema") a total of $452,020, for property loss and damage.  Because the trial

court did not err in denying ODOT's motion in limine, the judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} This appropriation action stems from an ODOT project to convert the intersection of State Routes 4 (Hayes Avenue) and 99 (Skadden Road) in Erie County, Ohio, from a two-way stop to a single lane roundabout. Neema owns two parcels of property abutting the routes to the west and east and totaling 8.9 acres. A Marathon gas station and convenience store operates on the northern, 3.0459-acre triangular parcel. The southern, 5.8047-acre parcel is vacant. Prior to the roundabout's construction, store patrons had five access points, two on S.R. 4 (drives 1 and 2), and three on S.R. 99 (drives 3, 4, and 5). Following construction, the two access points on S.R. 4 and only the southernmost access point, drive 5, on S.R. 99 remained.

{¶ 3} On September 16, 2022, ODOT filed an appropriation action in the Erie County Court of Common Pleas and deposited $47,475 with the clerk of courts which represented the total sum it believed would compensate Neema as a result of the appropriation. The action involved permanent and temporary easements and the taking of approximately two-tenths of an acre of land. Neema answered the complaint noting its refusal to accept ODOT's offer.

{¶ 4} Following discovery, which included the deposition of Neema's expert appraiser Dwight Kumler, ODOT filed a motion in limine requesting that the trial court prohibit Neema from presenting any evidence at trial regarding its expert's appraisal or owner's opinion of value. ODOT argued that the expert improperly valued the two parcels separately when he should have applied the "unit rule," which requires appraising

2.

the entire tract as a whole. ODOT also claimed that Neema's expert improperly valued the impact of the removal of the stop signs as a component of the damages to the residue. Finally, ODOT stated that the court should bar the owner's opinion testimony because it was based on the expert's improper appraisal. The court summarily denied the motion.

{¶ 5} The jury trial in the matter commenced on January 16, 2024. Consistent with its motion in limine, ODOT requested the opportunity to voir dire Neema's expert outside the jury's presence regarding his valuation process, including the valuation of the removed stop signs. Neema countered that ODOT was not entitled to a second opportunity to argue its motion in limine which had already been briefed and rejected by the court. Neema further argued the stop sign removal was a "non-issue" and would not be raised directly during the expert's testimony.

{¶ 6} ODOT responded that despite Neema's argument it would not present testimony regarding damages from the removal of the stop signs, the value assigned to the property during the expert's deposition remained unchanged. Neema again insisted that it was a non-issue because the expert did not attribute one dollar in compensation for the removal of the stop signs. The court denied ODOT's request.

{¶ 7} Neema's representative, Sunny Patel, testified that he has operated a gas station on the northern parcel of Neema's property since 2019. He explained that the property was ideally located between the turnpike and Cedar Point with high traffic volume in the summer. Prior to the taking, patrons could access the store's parking lot from either S.R. 4 or S.R. 99.

3.

{¶ 8} Patel testified that Neema made several improvements to the property, including connecting to the local water lines, installing indoor restrooms, reconfiguring the interior of the store, and installing EV charging stations.  Patel stated that the improvements totaled over $600,000.

{¶ 9} Patel asserted that drives 1 through 4 were generally utilized by passenger vehicles. He testified that prior to the taking, store patrons had direct access to the gas canopy, which included four gas pumps, by drives 3 and 4 off S.R. 99.

{¶ 10} The gas station has a diesel canopy located at the back of the northern parcel.  Patel stated that semi-trucks and larger vehicles generally accessed these fuel pumps by using drive 5.  He maintained that passenger vehicles generally avoided drive 5 because they had to traverse the unpaved, bumpy, and unlit portion of the lot.  Passenger vehicles would also have to navigate approximately 6 to 7 tractor-trailers frequently parked in the area.  Three short video clips of the gas station depicting the flow of truck traffic, including numerous parked trucks, were played for the jury.

{¶ 11} The appropriation caused drive 5 to be relocated further south onto the southern parcel.  Patel testified that Neema put down asphalt shavings to improve the drive's condition but that it continually deteriorates due to truck traffic and weather.

{¶ 12} Before the appropriation, fuel trucks entered the property from drives 4 or 5 and exited through drive 3.  According to Patel, fuel deliveries are now more difficult because the trucks had to enter and exit through drive 5.

4.

{¶ 13} Patel testified regarding the general impact the reconfiguration had on the flow of traffic on the property. He stated that S.R. 99 now lacks a clear entrance to the gas station and that the truck parking in the area adds to the congestion. Patel testified that patrons going south on S.R. 4 generally do not turn into drive 2 (the drive closest to the roundabout) for fear of backing up traffic. He stated that there is also a double yellow line and it is unclear whether you can legally turn left onto the property.

{¶ 14} Patrons often pass drive 2 and enter drive 1, on the western side of the property. Patel testified that the EV chargers are located on that side of the property and that due to the congestion, they disconnected the south charger over fear that either it or the nearby propane tank could get hit.

{¶ 15} Patel asserted that the northern parcel can no longer be considered a corner parcel because it has no ingress or egress on S.R. 99, which he contends decreased its salability.

{¶ 16} Patel testified that the State offered $47,000 in compensation for the appropriation. He rejected the offer because the cost of work needed to improve the interior mobility of the property far exceeded the offer. Patel said that the sum offered barely covered moving the gas station sign.

{¶ 17} Patel stated that ODOT's temporary easements included drives 2 and 5. Drive 2 was closed for the month of August, peak tourist time, while they connected the roundabout. Patel noticed a dramatic decrease in customers.

5.

{¶ 18} Neema's counsel asked Patel what he believed the value of both parcels was before and after the appropriation. ODOT objected, arguing that Patel's deposition testimony evidenced that he had no independent valuation and that the answer would rely on the valuation of the appraiser; thus, at minimum, the testimony is cumulative. The court overruled the objection. Patel testified that before the construction, he valued the property at 1.5 million. He believed that the property decreased approximately $500,000 in value after the construction. Patel agreed that his and the appraiser's valuations were consistent.

{¶ 19} On cross-examination, Patel acknowledged that after the appropriation, patrons still had access to the station from S.R. 4, using drives 1 and 2, and S.R. 99, but only through the dirt road on drive 5.

{¶ 20} Neema's appraiser, Dwight Kumler, testified, over a continuing objection, that Neema hired him to prepare a market value appraisal of the property. Kumler's July 3, 2023 report details the history of the property, including the gas station operating on the northern parcel, and the improvements made to the property.

{¶ 21} Kumler testified that he valued the entire property, assigning separate values to the northern and southern parcels. Prior to the taking, the parcels totaled 8.8866 acres, after the taking, 8.6419 acres. Although ODOT took only a small physical amount of property, Kumler stated that the residual property sustained significant damage. He attributed the main source of the damage to the removal of drives 3 and 4 off of S.R. 99. He stated:

6.

> [T]he proposed taking by ODOT will result in two curb cuts being removed along the west side of State Route 99 and thus reduce the subject's functional utility from that of a typical corner parcel to that of a less desirable interior parcel. It will also inhibit the free flow of vehicles about the site.

Kumler explained that inhibited traffic flow results from the reduction to one access point on S.R. 99, roughly 300 feet from the building and previously the least used route by passenger vehicles.

{¶ 22} Kumler valued the pre-taking property at $1,518,000. Using the sales comparison valuation approach, he separately valued the northern parcel at $1,050,000. Kumler explained that reviewing similar sales is the most useful approach in valuing older properties. The computation represents a per pump valuation of $175,000, which Kumler arrived at by reviewing comparable, recent gas station sales. Finding comparable sales, Kumler looked at whether the stations were located on interior corner parcels, the age of the improvements, number of gas pumps, and overall location. Kumler stated that corner parcels had higher values ranging from 22 to 37 percent.

{¶ 23} Kumler used the same sales comparison approach when valuing the vacant southern parcel. The sales ranged from $52,000 to $91,000 per acre. He testified that the pre-taking value was $80,000 per acre, or $468,000. After the taking, Kumler's appraisal was $464,000 which represented the reduction in actual acreage.

{¶ 24} Kumler used the income approach in valuing the loss from the temporary easements. He considered the nuisance of the construction itself including storage of construction vehicles and materials and concluded that $66,000 was fair compensation.

7.

Kumler concluded that $40,000 would compensate Neema for the removal and replacement of the gas station sign.

{¶ 25} During cross-examination, ODOT questioned Kumler regarding his prior deposition testimony. Kumler acknowledged that the operation of a gas station and convenience store is the property's highest and best use. Kumler agreed that he conducted an initial appraisal of the property in August 2022, and that his final report is dated July 2023. Kumler also agreed that the appraisal numbers were unchanged.

{¶ 26} Kumler agreed that the property has access on S.R. 4 and that it still has access on S.R. 99, though reduced from three access points to one. Kumler acknowledged that the property still functions as a gas station and convenience store.

{¶ 27} ODOT then presented the expert testimony of Gina Balsamo, a traffic engineer, who conducted a site circulation analysis within the property. Her staff visited the site, reviewed videos provided by ODOT, and used an "industry standard" software known as AutoTURN to simulate ingress and egress to the property, travel to the fuel pumps and convenience store, and the charging stations both before and after construction.

{¶ 28} Balsamo reviewed several AutoTURN program photos for the jury. She concluded that passenger vehicle traffic could continue to access the fuel pumps, the store, and the EV charging stations using the remaining drives. Patrons were also able to use the drives to exit the property. Balsamo testified that trucks, both fuel delivery and those filling up with diesel fuel, had sufficient room to maneuver around the property

8.

including ingress and egress.  Balsamo ultimately concluded that the closure of the two drives on S.R. 99 would not adversely impact the site because vehicles could "still come onto site from all the different directions and leave the site from all the different directions as they could before."

{¶ 29} Neema cross-examined Balsamo about her opportunity to personally observe the "post take" traffic flow.  In addition to the hour video, Balsamo stated that she drove past the site on the way to court that morning.  She reiterated that the AutoTURN simulator showed the taking had no adverse effect on the site.  Balsamo admitted that the simulation ran one vehicle at a time and maneuvered around permanent structures, not parked vehicles.  She agreed that the program failed to consider truck congestion.  It also failed to consider the unpaved condition of drive 5, specifically the potholes.  Balsamo stated that drivers watch for such hazards and would be able to avoid them.

{¶ 30} Another ODOT expert, licensed real estate appraiser Sean Farmer, conducted two formal visits and inspections of Neema's property resulting in two appraisals.  His initial January 2022 appraisal set the appropriation damages at $47,400. Farmer conducted a second appraisal for litigation purposes that he issued in June 2023.

{¶ 31} Farmer stated that he valued the property to determine its highest and best use.  He explained that the term highest and best use is the "reasonably probable use of property that results in the highest value."  Farmer determined that Neema's current use of the property was its highest and best use.

9.

**{¶ 32}** Finding it appropriate under the circumstances, Farmer testified that he valued both parcels as one and used all three valuation approaches— the cost approach, sales comparison approach, and the income approach— to determine the fair market value of the property before and after the taking. Farmer stated that he did so as a check to aid in ensuring the appraisal's accuracy. Farmer then explained the comparables he used in under each approach.

**{¶ 33}** Using the cost approach, Famer set the pre-taking value of the property at $1,154,090. The sales comparison approach yielded a $1,062,500 value for the property. Finally, the income approach set the value at $1,069,315. Famer then determined that the most accurate was the sales comparison approach – and set the pre-taking value of the property at $1,065,000.

**{¶ 34}** In determining the post-taking value, Farmer factored in the easements, the loss of land, and the loss of the two drives. He reviewed and included Balsamo's site circulation study in his report. Farmer stated that the permanent easements along S.R. 99 did not impact the property's functionality and caused no damage to the residue. Likewise, Farmer concluded that the 18-month temporary easements, impacting approximately .0422 acres, did not decrease the value of the residue.

**{¶ 35}** Farmer testified that he attributed no loss of value to the residue following the removal of drives 3 and 4. He felt that the closure had no long-term impact on the fair market value of the property. Farmer saw no compensable, adverse impact to internal circuity. Farmer acknowledged Neema's entitlement to approximately $30,000

10.

in compensation for the removal, relocation, and replacement of the Marathon sign. Farmer also assigned a $3,600 "cost to cure," or damages mitigation sum. In other words, Neema would receive compensation for the value of a new sign, not the depreciated value of the removed sign.

{¶ 36} After the taking, using the cost approach Farmer valued the entire property at $1,056,780. With the sales comparison approach he set the value at $1,020,000. Under the income approach Farmer valued the property at $996,260. Farmer assigned $1,018,910 as the final post-taking value of the property.

{¶ 37} Farmer stated that he valued the temporary easements at $260 after setting the per acre value at $40,000 and comparing the area of the takings with the 18-month duration. He set the total amount of compensation for the takings at $46,090; $9,790 for the permanent easement and $36,300 for the sign replacement.

{¶ 38} On cross-examination, Farmer acknowledged that he conducted over one thousand appraisals in appropriation cases though never representing a private property owner. He also agreed to never valuing a gas station. Farmer did not consider it important to review the site traffic videos prior to his valuation. And he did not consider the number of passenger vehicles using drive 5 or how many tractor trailers park in the area. Farmer admitted that multiple tractor trailers could impact the flow of traffic in the area. He agreed that the closed drives were closer to the market and that one drive is not equivalent to three. Farmer further acknowledged that drive 5 was unpaved.

11.

**{¶ 39}** Following the close of the evidence and jury instructions and deliberations, the jury assessed the award to be paid to Neema as follows:

> Number 1, Compensation for property taken .2447 acres, $19,500
> Number 2, Compensation for taking or existing improvements, The Take, $38,000
> Number 3, Compensation for temporary easements, The Take, $520
> Number 4, Damages to the remaining land- The Residue, if any $394,000.
> Total award $452,020

**{¶ 40}** This appeal followed.

## II. Assignments of Error

> Assignment of Error No. 1: The Trial Court erred to the material prejudice of ODOT by allowing Neema to present improper appraisal evidence and testimony of valuing the property by combining separate values of each tax parcel within the property.

> Assignment of Error No. 2: The Trial Court erred to the material prejudice of ODOT by allowing Neema to present evidence and testimony of its appraiser's damages to the residue because a significant but unquantified component of his damages was the non-compensable removal of stop signs from the highway intersection.

## III. Analysis

### A. Standard of Review

**{¶ 41}** The parties dispute the appropriate appellate standard of review. ODOT asserts that a de novo standard of review applies because the appeal involves the method of valuation which is a question of law. Conversely, Neema contends that a trial court's decision to admit or exclude expert testimony is reviewed for an abuse of discretion.

**{¶ 42}** Neema is correct that "a discretionary standard of review ordinarily applies to trial court decisions concerning the admissibility of evidence." *Wray v. Wessell*, 2016-

12.

Ohio-8584, ¶ 13 (4th Dist.), citing *State v. Morris*, 2012-Ohio-2407, ¶ 19. Further, "in an appropriation proceeding, 'the admission and exclusion of evidence as to the value of the land and other related subjects rests to large extent in the discretion of the trial court, and, where it is apparent that such court did not abuse its discretion in these respects and that no prejudicial error has intervened, a reviewing court will not interfere.'" *Id.*, quoting *Ohio Turnpike Comm. v. Ellis*, 164 Ohio St. 377, paragraph two of the syllabus (1955). "When, however, an appellant alleges that a trial court's evidentiary ruling was '"based on an erroneous standard or a misconstruction of the law,"' an appellate court reviews the trial court's evidentiary ruling using a de novo standard of review." *Id.*, quoting *Morris* at ¶ 16, quoting *Castlebrook, Ltd. v. Dayton Properties Ltd. Partnership*, 78 Ohio App.3d 340, 346 (2d Dist.1992).

{¶ 43} The above language echoes the general principle that a court lacks the discretion to commit an error of law. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 38, quoting *State v. Boles*, 2010-Ohio-278, ¶ 26 (2d Dist.). Thus, the court will review, de novo, any legal questions the court will then determine whether the trial court abused its discretion in denying ODOT's motion in limine.

### B. Valuation of the Property

{¶ 44} ODOT asserts that the trial court erred by allowing Neema's expert to testify as to the separate value of each parcel. It relies on the premise that Ohio law requires that all separate interests or values on a property must be jointly valued as a "unit." It contends that property cannot be valued as the sum of its component parts. In

13.

support, ODOT cites *In re Appropriation of Easements for Highway Purposes (Preston v. Stover-Leslie Flying Serv., Inc.)*, 174 Ohio St. 441 (1963), *Sowers v. Schaeffer*, 155 Ohio St. 454 (1951), *United States v. Dunnington*, 146 U.S. 338 (1892), *United States v. 4.620 Acres of Land*, 2022 WL 214636 (S.D. Texas Jan. 25, 2022), and *Smith v. Hendel*, 1989 WL 49492 (3d. Dist. May 11, 1989).

{¶ 45} In *Preston*, the Supreme Court of Ohio held that in an appropriation action "the existence of mineral deposits is to be considered in determining the market value of the land;" however, "the market value may not be reached by combining the separately evaluated land and deposits. *Id.* at paragraph two of the syllabus. The court explained that "[t]he underlying basis for rejecting evidence of the value of minerals separate and apart from the overall value of the land is that it involves an estimation of future profits to be derived from the mining and marketing of such materials." *Id.* at 447.

{¶ 46} In *Sowers*, the Court held:

> In the event there are several interests or estates in the parcel of real estate appropriated, the proper method of fixing the value of each interest or estate is to determine the value of the property as a whole, with a later apportionment of the amount awarded among the several owners according to their respective interests, rather than to take each interest or estate as a unit and fix the value thereof separately.

*Id.* at. paragraph one of the syllabus; *see also Dunnington* at 352-353 (rejecting an argument that the government be required to distribute payment of the value of the condemned land to life estate holders and heirs to the confiscated property.).

{¶ 47} In *Hendel*, the Third District Court of Appeals affirmed the trial court's exclusion of testimony of the *potential* subdivision of the appropriated property as the

14.

property's highest and best use because it was too speculative. The court noted that such evidence is admissible only where the adaptability of and demand for the land has been established. *Id.* at \*6.

{¶ 48} Finally, in *4.620 Acres of Land*, the district court denied reconsideration of its alleged misapplication of the "unit rule established in the Fifth Circuit." *Id.* at \*2. Defendant argued that while the rule barred the aggregating things upon the land, such as trees and buildings or various legal interests, it did not preclude the separate valuations of land per acre or "economic units" for a combined overall value. *Id.* Rejecting the argument, the court concluded that the separate appraisal of the northern unit, with road access, and the southern unit, landlocked and located on a floodway, was erroneous as the property would sell as one unit. *Id.* at \*5.

{¶ 49} Contrary to ODOT's position, Ohio case law reveals no controlling "unit rule" which would require an appraisal to jointly value separate tax parcels. Further, the cases ODOT relies upon are all distinguishable from this case. Here, Kumar did not value separate attributes on or interests in the same parcel; rather, he valued each legally distinct parcel, capable of being sold separately, and arrived at a total sum.

{¶ 50} Notably, at trial ODOT's own expert acknowledged that each parcel could have been valued separately but, without elaboration, stated that in this instance he felt it was appropriate to appraise the parcels as an entire unit. Accordingly, the trial court did not err in allowing Neema's appraisal evidence. ODOT's first assignment of error is not well-taken.

15.

{¶ 51} In its second assignment of error, ODOT contends that the trial court erred by allowing Kumler to testify regarding the damage to the property's residue when he based the sum, in part, on ODOT's removal of two stop signs which was determined to be lawful and non-compensable. ODOT points to Kumler's deposition testimony where he stated that the loss of the stop signs was a "significant component" of his damages valuation. ODOT contends that this admission tainted his overall valuation.

{¶ 52} Conversely, Neema asserts that ODOT misconstrued Kumler's deposition testimony and that he specifically declined to quantify damages for the removal of the stop signs. Neema quotes a later portion of Kumler's deposition where he states that absent the removal of the two drives there would have been virtually no change in the functional utility of the property. Kumler stated:

> Q. If none of the drives were being taken but just the land alone, would you have likely concluded that there would have been a change in functional utility of the property?
> A. Virtually none.
> Q. Okay. What about the loss of access? If no property was taken but the drives were closed off, if that's all that happened, would that cause a change in the functional utility of the property?
> A. the loss of access is the major component of loss in functional utility to the site.

This testimony is harmonious with Kumler's trial testimony. Additionally, neither Kumler's report, admitted into evidence, nor his trial testimony mentions the loss of the stop signs.

16.

{¶ 53} Reviewing the parties' arguments and the testimony presented at trial, there is no evidence that the trial court abused its discretion by allowing Kumler's valuation testimony. ODOT's second assignment of error is not well-taken.

### IV. Conclusion

{¶ 54} Upon due consideration, the judgment of the Erie County Court of Common Pleas is affirmed. Pursuant to App.R. 24, ODOT is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J. _____

_____
JUDGE

Gene A. Zmuda, J. _____

Charles E. Sulek, P.J. _____
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.