**William E. TROUTT, Plaintiff-Appellee,**

v.

**E.C. BRANHAM, Sr. and E.C. Branham, Jr., Defendants-Appellants.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Aug. 5, 1983.

Application for Permission to Appeal Denied by Supreme Court Nov. 21, 1983.

Charles H. Beaty, P.C., Gallatin, for plaintiff-appellee.

Henry A. Seligmann, Seligmann & Youngblood, Nashville, for defendants-appellants.

## OPINION

LEWIS, Judge.

This is an appeal by defendants E.C. Branham, Sr. and E.C. Branham, Jr. (Branhams) from a judgment finding them liable to plaintiff William E. Troutt (Troutt) as a result of the Branhams' cattle damaging Troutt's corn crop.

Troutt and the Branhams rented two different parts of a Sumner County farm from William H. McClain. Troutt planted corn on the part he rented and the Branhams pastured fifty-one cows, two bulls, and twenty-five or thirty calves on the part they rented. A single fence separated the cornfield and the pasture.

Somehow a gate in this fence became completely disconnected from both the hinge post and the latch post and fell to the ground. Apparently most of the cattle entered the cornfield, feasting upon and trampling a large portion of the corn. It can be inferred from the proof that the cattle were in the cornfield at least overnight and perhaps up to forty-eight hours.

Upon being informed that the cattle were in his cornfield, Troutt went to the site and removed approximately twenty head. He attempted to remove the remainder but was unable to do so. A herdsman employed by the Branhams, after learning the cattle were in Troutt's cornfield, went to the site and removed the remainder of the cattle.

Troutt brought this suit seeking to recover $8,880.64 in damages to the 1981 corn crop and, due to the growth of Johnson grass caused by that damage, $6,469.05 damages to the 1982 crop.

At the conclusion of a bench trial, judgment was entered for Troutt in the sum of $15,439.69.

The Branhams have presented two issues: (1) that the Trial Court erred in the amount of damages awarded, and (2) that the evidence preponderates against the Trial Court's finding that they were negligent.

We first discuss the issue concerning damages.

The Branhams labeled the damages to the 1982 crop as "future damages" and then, without citation, attacked the award for 1982 as speculative and "totally erroneous." The damages for 1982 had already been incurred and were known at the date of trial in November, 1982, and were neither future damages nor speculative. Defendants introduced no evidence to controvert the basis or amount of the 1982 damages.

The Branhams next object to the method of computing damages to the 1981 corn crop. They correctly contend that the proper "measure of damages for injury to or destruction of growing crops is their value at the time of injury or destruction, and not what they, in the opinion of the jury, would have been worth if allowed to mature." *Chicago M & G Rail Co. v. Wheeler,* 1 Tenn.App. 100, 111 (1925).

However, the Branhams have ignored the accepted method of calculating the dollar amount to be awarded. We find a succinct statement of that method in *United States v. 576.734 Acres of Land,* 143 F.2d 408, 409 (3rd Cir.1944), *cert. denied* 323 U.S. 716, 65 S.Ct. 43, 89 L.Ed. 576 (1944):

The basis of compensation is the value of the unmatured crop at the time it is destroyed. But since it is not customary to buy or sell growing crops as such, no effective market value, in this sense, ordinarily exists. The formula adopted has been to take evidence on the probable yield and value of the crop when harvested at maturity and the cost of further care and cultivation, harvesting and marketing the crop, in order to determine the actual realizable value of the crop when destroyed; or what the crop when har-vested would have brought, less the prospective costs of cultivation, harvesting, and marketing. [Footnotes omitted.]

Troutt proved probable average yield absent damage by comparison to the 1981 average yield on the same crop in a similar field. He testified that he had an oral contract to sell all of his crop over fifteen thousand bushels to the Martha White Company at $4 per bushel. He also testified that the crop when damaged required no further work, that it had been "laid by" until harvest time. The Branhams did not counter this testimony.

While Troutt carried his burden of proving his damages, the Branhams failed to prove any off-setting amount, such as costs of harvest, storage, and transportation.

The issue as to the amount of damages is without merit.

A resolution of the issue of liability requires an examination of the law governing the confinement of livestock.

■ The common law provided "that the proprietor or tenant of land is not obliged to fence it, but every man is at his peril to keep his cattle on his own premises." 4 Am.Jur.2d *Animals* § 49 at 300 (1962). This rule imposed absolute liability on the livestock owner for any damages caused by trespassing animals. In the early years of our statehood, the General Assembly replaced this common law rule with a statutory scheme designed to allow livestock to run at large without, under certain circumstances, the risk of absolute liability on the owner.

When livestock were formerly permitted to run at large, the law provided that a "lawful fence" could be erected to keep livestock out of an area to protect planters. If roaming animals breached that lawful fence, then their owner was absolutely liable for all resulting damage. T.C.A. § 44–9–106. The livestock owner was liable only if the lawful fence was constructed according to statutory requisites.

■ When the damage was caused by livestock which were "notoriously mischie-

vous," their owner could not let them run at large but had to enclose them. Upon failure to enclose, an owner was absolutely liable for damages even if the breached fence of the planter was not a lawful fence. T.C.A. §§ 44–9–109 through 44–9–111. The condition of the planter's fence was not at issue with notoriously mischievous livestock, only the character of the animals was in question. *Smith v. Jones,* 95 Tenn. 339, 32 S.W. 200 (1895).

■ In 1947, the legislature enacted Chapter 52, Public Acts, which required all livestock to be enclosed. T.C.A. § 44–8–101. Under the 1947 law, the owner of escaping animals is not absolutely liable for damages to another's property but is only liable where he knowingly or negligently permits their escape or fails to recapture. *Overbey v. Poteat,* 206 Tenn. 146, 332 S.W.2d 197 (1960); *Groce Provision Co. v. Dortch,* 49 Tenn.App. 57, 350 S.W.2d 409 (1961); *Moon v. Johnston,* 47 Tenn.App. 208, 337 S.W.2d 464 (1959). *See Rodgers v. Webb,* 335 F.Supp. 584 (E.D.Tenn.1971). As in other tort situations, all circumstances are relevant to determination of that liability, including the condition of the livestock owner's fence and the character of the livestock. *Overbey* 206 Tenn. at 150, 332 S.W.2d at 199; *Moon* 47 Tenn.App. at 217, 337 S.W.2d at 468.

Although not specifically repealed with the passage of Chapter 52, Public Acts of 1947, the mischievous livestock statutes, T.C.A. §§ 44–9–109 through 44–9–111, are essentially impossible to reconcile with legislative policy of contemporary law. However, we are of the opinion that under either T.C.A. §§ 44–9–109 through 44–9–111, or T.C.A. § 44–8–101, Troutt has failed to carry his burden of proof.

We first review this case to determine whether the evidence preponderates against the Trial Court's judgment that the Branhams were negligent under T.C.A. § 44–8–101 in allowing the escape of their cattle. Tenn.R.App.P. 13(d). Under that statute, the condition of the Branhams' fence and the character of their cattle are relevant circumstances in determining whether they were negligent.

The standard of duty required of the Branhams is that they enclose their livestock with a "lawful fence [or a] . . . fence such as is generally required to restrain" cattle. *Wilson v. White,* 20 Tenn.App. 604, 607, 102 S.W.2d 531, 533–34 (1936). While the fence in question was a joint fence, the Branhams had accepted the duty of maintaining the fence.

The Branhams' cattle exited their pasture and entered the cornfield through a twelve-foot gate that somehow fell to the ground off its hinges and its latch device on the opposite post. The hinges were "L" shaped and were screwed into the hinge post horizontal to the ground then turned upward at a ninety-degree angle. The gate had "round circle rings," perhaps short metal cylinders, that slipped down over the upright part of the hinges. The gate hung "by virtue of its own weight and a binding motion on the hinges." There was no formal latch and closing was accomplished "either by wire or bailing twine or . . . barbed wire fence." This record is silent as to what type of latch is customary for a gate of this type.

There is no evidence in the record as to what caused the gate to fall or be removed. Troutt testified on cross-examination that he had no knowledge of how the "gate actually got down" and that to his knowledge the "gate [had] never been down before." He "speculate[d] that a cow was rubbing against it and knocked it off its hinges." He further speculated that it was possible that one of the Branhams' cattle had gotten its head under the gate and when it raised its head the gate had been lifted off its hinges and had fallen down.

There is no evidence in the record that the Branhams' cattle had been known to knock gates off hinges or to push a gate down.

The evidence only shows that the cattle escaped from the pasture into Troutt's cornfield, that the fence gate was found laying on the ground on the pasture side of the fence, and that the fence gate, when hang-

ing, was ten to twelve inches off the ground.

For Troutt to recover in this case, he must show that the Branhams were negligent in allowing the cattle to escape from the pasture. "[N]egligence is never presumed from an accident alone, but must be proved by either direct or circumstantial evidence, or both." [Citations omitted.] *Moon* 47 Tenn.App. at 217–218, 337 S.W.2d at 469. The Branhams are not liable if without their fault the cattle escaped from a pasture enclosed by a lawful fence or by an ordinary fence such as is generally required to restrain that kind of stock. *Wilson* 20 Tenn.App. at 607, 102 S.W.2d at 533–534. This record is devoid of evidence that the fence in question was not a lawful fence or an ordinary fence such as is generally required to restrain cattle.

Both as a circumstance under T.C.A. § 44–8–101 and as an independent ground of recovery under T.C.A. § 44–9–109, this record fails to show that the Branhams' cattle were "notoriously mischievous, known to be in the habit of throwing down or jumping fences."

The Branhams had kept the same herd in the pasture rented from McClain for four years. During that time there were seven incidents of cattle getting out. Some of these escapes were caused by an automobile running into and knocking holes in the fence. One escape was caused by a cattle guard which had filled up with dirt, and some of the escapes were by a single calf. The proof falls far short of showing that the cattle were "notoriously mischievous."

There is an absence of either direct or circumstantial evidence of negligence on the part of the Branhams.

The preponderance of the evidence in this case is contrary to the Court's finding. Where the preponderance of the evidence does not support the trial court's findings, we must set aside the judgment. Tenn.R.App.P. 13(d).

The judgment of the Trial Court is reversed and the cause dismissed with costs to appellee Troutt. The cause is remanded to the Trial Court for the collection of costs and any further necessary proceedings.

CANTRELL and CONNER, JJ., concur.