# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
June 9, 2015 Session

## HADDAD FAMILY PARTNERSHIP v. DAVID POUNCEY, ET AL.

**Direct Appeal from the Chancery Court for Tipton County**
**No. 30009     Don R. Ash, Senior Judge**

---

**No. W2014-01761-COA-R3-CV – Filed July 21, 2015**

---

This case involves a dispute over the boundary line between two neighboring tracts of farmland. The owner of one farm brought this action alleging that the neighbor crossed the common boundary line between the tracts and harvested or destroyed crops during three consecutive years. At trial, the parties presented conflicting surveys, each purporting to establish the correct boundary line between the properties at issue. The trial court found the appellee's survey to be more persuasive and established the line as proposed by the appellee. The trial court also awarded damages to the appellee for the lost crops. Because the evidence does not preponderate against the trial court's findings, we affirm and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

David Edward Owen, Covington, Tennessee, for the appellants, David Pouncey, Wilbur David Pouncey Living Trust, Willard Berford, Casey Berford, and Rodney Berford.

Thomas D. Forrester and  Rachel Kathryn Gangaware, Covington, Tennessee, for the appellee, Haddad Family Partnership.

## OPINION

### I. Background

The case before us involves a disputed boundary line between two tracts of farmland in Tipton County, Tennessee. Haddad Family Partnership ("Haddad") owns 208 acres of farmland near the Mississippi River. The property lying directly to the north

of the Haddad tract is owned by the Wilbur David Pouncey Living Trust ("Pouncey"). Pouncey owns approximately 430 acres. The Haddad family and the Pouncey family farmed on the adjacent properties for decades without a dispute as to the common boundary.

Franky Delashmit has been farming the Haddad property for the Haddad family since 1981. He also worked as a sharecropper for Pouncey in 2003 and 2004. Since at least 1981 when Mr. Delashmit began farming the property, the northern portion of the Haddad property has contained a "field road" or access road, which Haddad has used for traveling back and forth to its irrigation system, among other things. The field road is 15 feet wide and runs from east to west across the Haddad property. The Haddad family considers the field road itself to be located on their property but basically has treated the road as indicative of the boundary between the properties. Mr. Delashmit has always used the road as a marker, indicating the northern point at which he should stop planting for Haddad. Likewise, the farmers for Pouncey did not plant or harvest beyond the field road. When Mr. Delashmit planted and harvested crops for Pouncey in 2003 and 2004, he also planted and harvested Pouncey's crops just up to the field road.

The boundary line dispute arose sometime in the winter of 2009-2010. For at least 75 years, a single pecan tree has grown in the middle of these fields near the boundary line between the Pouncey and Haddad properties and near the field road.[1] Toward the northeast corner of the Haddad property, a tree line runs from east to west. It was Mr. Pouncey's understanding that the common boundary is located a few feet south of the pecan tree and runs even with the tree line to the east, such that the pecan tree is located on the Pouncey property. According to Mr. Pouncey, Haddad's field road has historically been located south of the pecan tree, but it was gradually moved northward over the years to run north of the pecan tree, crossing over onto his property. Mr. Pouncey decided to make it clear to Mr. Delashmit and Haddad that the property line was actually located south of the placement of the existing field road, so he drove steel posts into the ground at a point south of the field road. He told Mr. Delashmit that the post represented the location of the Haddad-Pouncey boundary line and instructed Mr. Delashmit not to cross the line.

In response, Haddad requested a survey to be performed by Paul Erwin in order to locate and confirm the boundary line between the Haddad property and the Pouncey property. The April 2010 survey performed by Mr. Erwin found that the existing field road and the land south of it belong to Haddad. Mr. Erwin placed several stakes along the line that he determined to be the boundary, which was located north of the pecan tree.

---

[1]According to Mr. Pouncey, it was common for farmers to leave pecan trees standing in the midst of open fields because pecans were worth "quite a bit of money" per pound.

At some point, Mr. Pouncey removed the stakes placed by Mr. Erwin in connection with his survey. Around May of 2010, Mr. Pouncey's farmers planted soybeans over the existing field road on the disputed portion of land. When Mr. Delashmit went to plant soybeans for Haddad, he noticed that Mr. Pouncey had already planted on four to five acres of land that Haddad had planted in the past. Mr. Delashmit simply planted Haddad's soybeans over the soybeans planted by Mr. Pouncey, up to the edge of the field road. In the fall of 2010, Mr. Pouncey's farmers harvested the soybeans on the disputed portion of land, over and south of the field road, including the soybeans planted by Haddad.

The next year, in the spring of 2011, Mr. Delashmit planted Haddad's soybeans up to the field road before Mr. Pouncey's farmers planted. In August 2011, Haddad hired Mr. Erwin to reshoot the boundary line and replace the missing stakes. Because Mr. Pouncey had threatened to remove any additional stakes, Haddad had fence posts set in concrete to mark the boundary. In the fall of 2011, Mr. Pouncey's farmers harvested the soybeans to a point even farther south than the year before, on an area of five to six acres. This included the Haddad crops planted by Mr. Delashmit on the disputed land, past the pecan tree and the line of posts placed by Haddad's surveyor.

The following winter, Mr. Delashmit informed Mr. Pouncey of his intention to plant corn on the disputed area the following year. Mr. Pouncey admittedly threatened to destroy the corn crop if Mr. Delashmit planted it on the disputed property. Nonetheless, that spring, Mr. Delashmit planted corn on the disputed property up to the field road. Mr. Pouncey's farmers subsequently sprayed and killed the corn crop and then planted soybeans over it and the field road. As a result, Haddad was unable to harvest any of the corn it planted.

On September 7, 2012, Haddad filed suit in the chancery court of Tipton County. By way of an amended complaint, the named defendants included the Wilbur David Pouncey Living Trust, David Pouncey and his wife, and three farmers he employed -- Willard Berford, Casey Berford and Rodney Berford. Haddad alleged that the Pouncey defendants crossed the common boundary line between the tracts of farmland and harvested or destroyed its crops during 2010, 2011, and 2012, causing Haddad to lose the use and economic benefit of its property. Haddad also alleged that the Pouncey defendants trespassed, converted, and caused damages to its crops, surveying stakes, and monuments.

Mr. Pouncey hired Van Boals in the spring of 2013 to conduct a survey in order to determine the correct boundary line between the properties. Mr. Boals' survey placed the boundary line 42.8 feet south of the line established by Mr. Erwin's survey and in line with the boundary proposed by Mr. Pouncey.

3

During a two-day bench trial, the court heard testimony concerning the disputed property and the two competing surveys. Paul Erwin testified in regards to the survey he conducted for Haddad. Mr. Erwin noted that Haddad never informed him of its opinion regarding the location of the disputed boundary. Mr. Erwin began by examining the deeds of the Haddad property and the adjoining properties to create a computer-generated title map based on the properties' legal descriptions. In creating the title map, he discovered that the latest Haddad deed was "an incomplete instrument," in that it included a specific bearing and distance for only three of the four sides of the Haddad tract. Mr. Erwin found a complete description of the fourth side (the western boundary) in a deed from 1927. However, when he used all of the information regarding the four sides to verify the mathematical correctness of the legal description of the property, he found that the Haddad deed contained an "error of closure" of 622 feet, which Mr. Erwin considered to be "a whole lot." Despite this error of closure, however, Mr. Erwin found that each of the deeds from 1910 to the current deed consistently called for the north line of the Haddad property to be common with the south line of the Dunlap Estate, which was the predecessor to the Pouncey property.

After gathering a complete legal description from his review of the Haddad deeds and the deeds of the adjoining properties, Mr. Erwin visited the property to attempt to find any markers for the Haddad property boundaries or the boundaries of adjoining properties. The Haddad property is intersected near its western side by Coon Valley Road, which is a gravel road running from north to south through the Haddad and Pouncey properties. Mr. Erwin located two iron stakes on the west side of the road several hundred feet apart. The deed from the adjoining property to the west called for one of these iron stakes to be the northwest corner of the Haddad property. The westernmost stake marked the southwest corner of the Pouncey property.

After discovering these initial points, Mr. Erwin continued east across Coon Valley Road toward the tree line in the northeast corner of the Haddad tract to attempt to find more markers. Around the tree line, he found "very scant evidence" of fence and wire in some trees and one or two old wooden posts. Going south, Mr. Erwin discovered a steel post on the bank of a large ditch, which he determined was likely to be the southeast corner of the Haddad property. However, when comparing the physical monumentation with the legal descriptions in the deeds, Mr. Erwin found that they did not "match up." Because Mr. Erwin knew that the Haddad deed was incomplete and also contained the error of closure, he decided to survey the entire south line of the Pouncey property, because all of the Haddad deeds consistently called for the north line of the Haddad property to coincide with the south line of the Dunlap estate.

Mr. Erwin returned to the property to perform additional field work in order to survey the south line of the Pouncey property and thereby determine the common

4

boundary line. He returned to the iron stakes to the west of Coon Valley Road, as the westernmost pipe marked the southwest corner of the Pouncey property. Using the distance called for in the Pouncey deed as a guide, he created a coordinate point approximately one mile to the east, which purported to be the Pouncey southeast corner. The Pouncey deed contained a description that originated in 1899 and called for the corner to be at a stake in a lake. Within three feet of the end point that Mr. Erwin measured, he located an iron stake, using a metal detector, at the edge of a body of water less than knee-deep. Mr. Erwin determined that the three iron stakes -- representing the Pouncey southwest corner, the Haddad northwest corner, and the Pouncey southeast corner -- all fell in an east-west line. Accordingly, he was satisfied that he had found the south line of the Pouncey property. To be sure, however, he also compared the common boundary line he located with the deed to the adjoining property to the east and determined that the line he established fit with the neighboring property line. Mr. Erwin determined that the remnants of posts and wire he previously found in the treeline were not intended to be a boundary line. Weeks later, upon further research, Mr. Erwin discovered records from a survey performed by Huber Green in 1960, when he was hired by the Pouncey family to survey the same common boundary line with the Haddad property. Mr. Green's notes from the 1960 survey established the south property line of the Pouncey property, and when Mr. Erwin created an overlay of his line and Mr. Green's line, they "checked out extremely well" and indicated that he "was following in the footsteps" of Mr. Green. Mr. Erwin also noted that it was Mr. Green's father who surveyed the original boundary line when the Pouncey deed description was created in 1899.

Van Boals testified at trial regarding the survey he conducted for Mr. Pouncey. He started by preparing a title map using the Haddad deeds and deeds of adjoining properties and comparing it to an aerial photograph. Like Mr. Erwin, Mr. Boals found that there was an obvious error in the Haddad deed concerning the measurements. Mr. Boals then visited the Haddad property to attempt to locate physical monuments and to survey the four sides of the Haddad property. Mr. Boals began at the far end of a neighboring property that lies directly west of the Haddad property and borders the Mississippi River. At the Mississippi River, he located a "T-post" that marked the southwest corner of the property, according to a 2010 recorded survey, in addition to a sewer easement. When asked why he began his survey at the far corner of a neighboring property "several thousand feet away" from the disputed boundary line, Mr. Boals said that this was the only "record monument" in the area, meaning, a monument that was mentioned in public records in the courthouse. He acknowledged, however, that surveys are not required to be recorded. Mr. Boals said the south line of the neighboring property continued eastward to form the south line of the Haddad property, where he located another T-post at the southeast corner of the Haddad property. In order to establish the south line of the Haddad property, Mr. Boals "struck a line" of approximately 6000 feet between the two

T-posts.

To establish the eastern boundary of the Haddad property, Mr. Boals went north from the T-post at the southeast corner and found six steel posts that aligned with the T-post, in addition to a 10-inch wooden post in the bank of a ditch, which he determined to be the northeast corner of the property. Neither the east line nor the south line established by Mr. Boals precisely coincided with the distances called for in the Haddad deed or the deeds of the adjacent properties. For instance, the measurement in the Haddad deed for the southern boundary and the actual measurement of the line set by Mr. Boals differed by over 550 feet. Mr. Boals attributed this discrepancy to the error of closure in the Haddad deed.

To establish the west line of the Haddad property, Mr. Boals used the T-post at the Mississippi River and measured the distance provided in the deed of the neighboring property owner to designate the southwest corner of the Haddad property. He then measured north based on the distance stated in the Haddad deed, but not as far north as the iron stakes Mr. Erwin found. Mr. Boals set the northwest corner of the Haddad property 42.8 feet south of the iron stake that Mr. Erwin determined to be the northwest corner of the property. Mr. Boals acknowledged the location of the two iron stakes and the fact that Mr. Green's field notes from 1960 also mentioned them. However, Mr. Boals was unsure as to whether Mr. Green found these iron pins or set them himself. Mr. Boals decided to disregard the two existing iron stakes and follow the distance measurements that were provided in the deed instead.

Finally, to establish the northern boundary, which was the disputed common boundary line between the properties, Mr. Boals measured from the northwest corner he established to the ten-inch wood post he found at the location he determined to be the northeast corner of the Haddad property. He said this line "was real close" to five trees "that seemed to trail this line to some degree," although none of them were perfectly aligned with the boundary. Mr. Boals never surveyed the Pouncey property because, he said, he was trying to establish the north line of the Haddad property rather than the south line of the Pouncey property.

In sum, the discrepancy between Mr. Boals' opinion and Mr. Erwin's opinion as to the location of the common boundary was approximately 42.8 feet. Mr. Boals was of the opinion that the lone pecan tree was on Pouncey's property; Mr. Erwin believed the tree was on the Haddad property.

The trial court also heard testimony relevant to the damages allegedly incurred by Haddad. According to Mr. Pouncey, the area in dispute consists of about 2.29 acres, "maybe slightly over that." Mr. Delashmit testified that the area contains about four

acres. Mr. Delashmit also testified about the average yield of crops per acre for the disputed area and the cost of soybeans and corn during the years in question. Based on those figures, Mr. Delashmit estimated that the damages totaled $3,300 in 2010, $4,041 in 2011, and $6,000 in 2012. However, Mr. Delashmit also noted that, as a sharecropper, he would have received half of Haddad's profits.

After hearing two days of testimony, the trial court ruled in favor of Haddad and adopted the boundary line established by Mr. Erwin in its order entered on March 26, 2014. The court ordered the Pouncey defendants to pay $6,670.50 to Haddad as damages for harvesting and destroying its crops in 2010, 2011, and 2012, and $400 as damages for removing the stakes set by Mr. Erwin. The Pouncey defendants filed a motion for new trial and motion to alter or amend, which the trial court denied on July 24, 2014. The Pouncey defendants timely filed a notice of appeal.[2]

## II. Issues Presented

The Pouncey defendants raise the following issues on appeal, which we have slightly restated:

1. Whether the trial court erred in adopting the boundary line established by the survey of Haddad's expert rather than the line established by the survey of Pouncey's expert.

2. Whether the trial court erred in the amount of damages awarded to Haddad.

For the following reasons, we affirm the decision of the chancery court.

## III. Standard of Review

"The usual standard of review applicable to bench trials applies in boundary disputes." *Dillehay v. Gibbs*, No. M2010-01750-COA-R3CV, 2011 WL 2448253, at *6 (Tenn. Ct. App. June 16, 2011) (citing *Jackson v. Bownas,* No. E2004-01893-COA-R3-CV, 2005 WL 1457752, at *6 (Tenn. Ct. App. June 21, 2005)). Therefore, Tennessee Rule of Appellate Procedure 13(d) governs our review. We review the trial court's decision *de novo* on the record with a presumption of correctness as to the findings of fact, unless the evidence preponderates against those findings. *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). For the evidence to preponderate against the findings, it must support another finding of fact with greater convincing effect. *Id.* (citing

---

[2]Mr. Pouncey's wife did not appeal.

*Rawlings v. John Hancock Mut. Life Ins. Co.,* 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). We review questions of law *de novo* with no presumption of correctness. *Langschmidt v. Langschmidt,* 81 S.W.3d 741, 744-45 (Tenn. 2002).

## IV. Discussion

We begin by addressing the trial court's decision to adopt the boundary line established by Haddad's surveyor, Mr. Erwin. Because the case before us involves a simple boundary line dispute, Haddad had the burden to prove clearly that it is the true owner of the property described in the complaint, pursuant to Tennessee Code Annotated section 16-11-106(b). *See Bridgewater v. Adamczyk*, 421 S.W.3d 617, 627 (Tenn. Ct. App. 2013). Appellants argue that the trial court erred in adopting the survey of Mr. Erwin rather than Mr. Boals, claiming that Mr. Boals' report was more accurate, complete, and convincing.

"In resolving a boundary line dispute, it is the role of the trier of fact to evaluate all of the evidence and assess the credibility of the witnesses." *Mix v. Miller,* 27 S.W.3d 508, 514 (Tenn. Ct. App. 1999) (citing *Norman v. Hoyt,* 667 S.W.2d 88, 91 (Tenn. Ct. App. 1983)). "Where there is a conflict in testimony, the trial court is in a better position than this Court to observe the demeanor of the witnesses and evaluate their credibility." *Jackson*, 2005 WL 1457752, at *6. On appeal, we give great weight to a trial court's determination as to the credibility of witnesses. *Estate of Walton v. Young,* 950 S.W.2d 956, 959 (Tenn. 1997). "This deferential standard specifically applies in a boundary dispute where a trial court must choose between two competing surveys." *Dillehay*, 2011 WL 2448253, at *6 (citing *Jackson,* 2005 WL 1457752, at *6). This Court explained the established standard for making a boundary line determination in *Mix v. Miller*:

> When determining a boundary line that is in dispute, the court must look first to the natural objects or landmarks on the property, then to the artificial objects or landmarks on the property, then to the boundary lines of adjacent pieces of property, and finally to courses and distances contained in documents relevant to the disputed property.

*Mix,* 27 S.W.3d at 513 (citing *Franks v. Burks,* 688 S.W.2d 435, 438 (Tenn. Ct. App. 1984); *Thornburg v. Chase,* 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980)).

In its simplest terms, this case involves a battle of the experts. The results of Mr. Erwin's survey and Mr. Boals' survey are significantly different, which may be due to the fact that the legal description in the Haddad deed is either incomplete or deficient.

At trial, Mr. Boals testified that he determined the disputed northern boundary of

the Haddad property by starting in the established southeast corner of an adjoining property and, from there, establishing additional corners based on a combination of measurements in the deeds and markers he found on the property.  He then struck a line between the points that he determined to be the northwest and northeast corners to create the disputed boundary line.  Mr. Erwin testified that he determined the Haddad property's northern boundary by locating the Pouncey property's southern boundary, as called for in the Haddad deed.  He located three pre-existing iron stakes that form a line, consistent with the deeds.  Additionally, after Mr. Erwin conducted his survey, he found the notes from the 1960 survey, which coincided with the line Mr. Erwin established.

After hearing the testimony of both surveyors and thoroughly considering each of the surveyors' methods and conclusions, the trial court agreed with the position of Mr. Erwin.  The trial court specifically expressed concern with Mr. Boals' reliance on the distances provided in the deed in his placement of the northwest corner, rather than relying on the existing iron stake.  The judge said:

> But basically what [Mr. Boals] did was, he starts on the [far corner of the adjoining] property that he says is kind of the gold standard -- where I should start. And then he goes across, which I think is fine, but then he goes up specifically -- specific footage it sets out in the deed. And that's short of the post.
>
> And his response to that is, he sets another post. And the reason I find that unreliable is that the footage on all the other sides of it are not correct either; they're all off. And it seems to me unreliable to then draw the line based upon specific distance and draw your own post when there are two posts up above you.

The court noted that deed distances fall at the bottom of the priority list when it comes to determining a disputed boundary line, yet that was what Mr. Boals chose to rely on rather than the existing iron stakes.  In short, the trial judge found Mr. Boals "very knowledgeable" but concluded that Mr. Erwin's methodology was "[m]ore reliable."

From our review of the record, the evidence does not preponderate against the trial court's finding that the survey conducted by Mr. Erwin defined the correct boundary line between the Haddad and Pouncey properties.  Given that the distances in the Haddad deed were obviously incorrect, we cannot say that the trial court erred in finding Mr. Erwin's methodology more reliable because it was based on existing markers.  Moreover, the trial judge had the unique opportunity to examine the survey maps in great detail alongside the surveyors.  The trial judge thoroughly questioned the surveyors regarding their methodology and conclusions.  The testimony is replete with references to locations

9

on the survey maps "where you've got your finger" or "right there" or "down here." This Court does not have the same ability to consider the testimony of the two experts while simultaneously observing their physical instructions with regard to the maps. After considering the evidence presented over the course of two days, the trial judge found Mr. Erwin's survey to be more reliable. "In light of the great deference this Court gives to a trial court's decision between competing surveys," *Bridgewater*, 421 S.W.3d at 627, we find no reversible error in the trial court's finding that Haddad's survey was preferable.

We next address whether the trial court erred in the amount of damages it awarded to Haddad. When calculating damages to crops:

> The basis of compensation is the value of the unmatured crop at the time it is destroyed. But since it is not customary to buy or sell growing crops as such, no effective market value, in this sense, ordinarily exists. The formula adopted has been to take evidence on the probable yield and value of the crop when harvested at maturity and the cost of further care and cultivation, harvesting and marketing the crop, in order to determine the actual realizable value of the crop when destroyed; or what the crop when harvested would have brought, less the prospective costs of cultivation, harvesting, and marketing.

*Troutt v. Branham*, 660 S.W.2d 502, 504 (Tenn. Ct. App. 1983). The Pounceys argue that the trial court erred in its calculation of damages by utilizing an inaccurate sum of acreage based on Mr. Delashmit's testimony and by failing to deduct cultivation and harvesting costs.

First, we examine the acreage. Mr. Pouncey testified that the disputed property consists of a narrow a strip of land 2,000 feet long, 40 feet wide on one end, and 90 feet wide on the other. Mr. Pouncey said he calculated the disputed acreage by taking the average between 40 and 90, for an average width of 65 feet, and multiplying that sum by 2000 feet. That calculation equaled 130,000 square feet. He then subtracted 30,000 square feet for the 15-feet-wide field road running the length of the property. This gave him 100,000 square feet, which he calculated to be roughly 2.29 acres, "maybe slightly over that," of disputed land in cultivation.

Mr. Delashmit, on the other hand, testified that the disputed property consists of a strip of land 2,500 to 2,600 feet long, 60 feet wide on one end and 80 feet wide on the opposite end. He testified that he "stepped off" the distance of the ends in order to determine their width, but he did not step off the length of the property. Mr. Delashmit estimated that the strip of land runs for "probably close to half a mile," or, more precisely, about 2500 to 2600 feet. Mr. Delashmit estimated that the entire strip of land

contains about four acres.[3] Mr. Delashmit was specifically asked whether the dimensions of the disputed property for purposes of computing lost crops should be 15 feet less in width than the figures cited in his testimony due to the location of the field road. He responded in the negative and explained that he measured the distances of 60 and 80 feet from the edge of the field road. He said that if one measured from the property line, the width of the disputed area would actually measure 75 and 95 feet.

On appeal, the Pounceys argue that Mr. Delashmit's testimony "is in direct conflict with the line staking measurements provided by Mr. Erwin[.]" However, as support for this assertion, they only generally cite the survey map designated as exhibit P-10. From this vague assertion, we can discern no conflict between exhibit P-10 and Mr. Delashmit's testimony.

The trial court did not make an express finding in its written order regarding the acreage in dispute. However, it is clear that the trial court accepted Mr. Delashmit's testimony and his calculation of Haddad's damages. When Mr. Delashmit testified regarding the cost of the lost crops, he consistently based his calculations on four acres of land being in dispute. The trial judge directly questioned Mr. Delashmit about his estimation of the acreage at four acres and said "[t]hat makes sense." We cannot say that the trial court erred in crediting Mr. Delashmit's testimony. He has been farming since 1968 and has farmed this particular property since 1981. The evidence does not preponderate against the trial court's implicit finding that the property in dispute consists of four acres.

The Pounceys also claim that the trial court erred in its calculation of the value of the lost crops. Mr. Delashmit testified the disputed tract of land produces roughly 70 bushels of soybeans per acre and 200 bushels of corn per acre. He stated that soybeans brought in $11.19 per bushel in 2010 and $13.64 in 2011, according to receipts he produced from those years. Receipts from 2012 showed that corn was sold at $7.46 per bushel. Using these figures, Mr. Delashmit estimated that the loss of income totaled $3,300 in 2010, $4,041 in 2011, and $6,000 in 2012. However, only half of that total would have been owed to Haddad; the other half belonged to Mr. Delashmit. The trial judge noted that Mr. Delashmit's estimation of damages totaled $13,341 and awarded Haddad half of that amount -- $6,670.50. On appeal, the Pounceys do not challenge the trial court's mathematical calculation except for the fact that, according to Pouncey, the trial court should have deducted an "allowance for costs of production." As noted above, when calculating damages for lost crops, the court is

to take evidence on the probable yield and value of the crop when harvested

---

[3]By our calculation (using Mr. Pouncey's methodology and Mr. Delashmit's figures), an average width of 70 feet multiplied by a length of 2550 feet would equal 178,500 square feet, or 4.1 acres.

at maturity and the cost of *further* care and cultivation, harvesting and marketing the crop, in order to determine the actual realizable value of the crop when destroyed; or what the crop when harvested would have brought, less the *prospective* costs of cultivation, harvesting, and marketing.

*Troutt*, 660 S.W.2d at 504 (emphasis added). Pouncey points out Mr. Delashmit's testimony that it cost $1,000 to input the soybeans on four acres and $1600 to plant and fertilize the corn. However, these were the sums that Haddad and Mr. Delashmit had already expended to plant and care for the soybeans and corn when Pouncey wrongfully harvested or destroyed those crops. Pouncey is not entitled to claim a deduction for amounts that Haddad already expended. From our review of the record, Pouncey failed to present any evidence regarding costs of *further* care and cultivation that Haddad was able to avoid. The only testimony relevant to this issue came during cross-examination of Mr. Delashmit regarding the poisoned corn crop from 2012:

> Q. How much money did you save by not planting that three or four acres, whatever it may be, that was in dispute during 2012?
>
> A. By not planting it?
>
> Q. Yes.
>
> A. It was planted.
>
> Q. Well, by not caring for it during the year. You didn't continue to fertilize and spray it, plow it?
>
> A. It was already fertilized when I planted it, and actually it was sprayed with Atrazine and a weed killer after it was planted, so it had all the chemicals on the ground. With fertilizer, chemicals, spraying and all, you're looking at $400 an acre in input, seed.

Because the Pounceys failed to present any evidence of offsets to reduce the total damages incurred by Haddad, the trial court did not err by failing to make deductions for such costs. *See Troutt*, 660 S.W.2d at 504 (concluding that the farmer "carried his burden of proving his damages," while the defendants "failed to prove any off-setting amount, such as costs of harvest, storage, and transportation.").

## V. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby

affirmed and remanded for further proceedings.  Costs of this appeal are taxed to the appellants, David Pouncey, Wilbur David Pouncey Living Trust, Willard Berford, Casey Berford, and Rodney Berford, and their surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE